IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,           )
                                    )
            Plaintiff,              )
                                    )
      -vs-                          ) Nos. 21-CR-356-CVE-1
                                    )      21-CR-356-CVE-2
(1)WILLIAM COLBY COX,               )
(2)LAURA KAY SAWYER,                )
                                    )
            Defendants.             )

* * * * *

TRANSCRIPT OF RECORDED PRELIMINARY HEARING
**BEFORE THE HONORABLE JODI F. JAYNE**
UNITED STATES MAGISTRATE JUDGE

AUGUST 16, 2021

* * * * *

A P P E A R A N C E S

     MR. DAVID NASAR, United States Attorney's Office, 110
West 7th Street, Suite 300, Tulsa, Oklahoma, 74119,
Assistant United States Attorney on behalf of the Plaintiff;

     MR. RICHARD LaMARR HATHCOAT, Aston Mathis Campbell,
PLLC, 2642 East 21st Street, Suite 250, Tulsa, Oklahoma,
74114, Attorney on behalf of Defendant Cox;

     MR. STEPHEN G. LAYMAN, Layman & Morris, PLLC,
401 South Boston Avenue, Suite 500, Tulsa, Oklahoma, 74103,
Attorney on behalf of Defendant Sawyer.

TRANSCRIBED BY:          KEN SIDWELL, CSR-RPR
                         Kenneth_Sidwell@oknd.uscourts.gov
                         (918) 671-7816

GOVERNMENT'S WITNESS

WITNESS                                                           PAGE

**Rebecca Loeb**
    (Direct Examination by Mr. Nasar)                         4
    (Cross-Examination by Mr. Layman)                        15
    (Cross-Examination by Mr. Hathcoat)                      18
    (Redirect Examination by Mr. Nasar)                      37

<u>AUGUST 16, 2021 RECORDED PROCEEDINGS</u>

*(On the record at 11:02 a.m.)*

1    THE CLERK:  This is United States versus Laura Kay

2    Sawyer, case number 21-MJ-549-SH, and William Colby Cox,

3    case number 21-MJ-550-SH.  Counsel, please enter your

4    appearances.

5         MR. NASAR:  David Nasar on behalf of the United

6    States.

7         MR. LAYMAN:  Stephen Layman for Defendant Sawyer,

8    who's present in custody.

9         MR. HATHCOAT:  Richard Hathcoat for William Cox,

10   Your Honor.

11        THE COURT:  And let the record reflect Mr. Cox is

12   present in the courtroom and also in custody.

13             This matter is set for a preliminary hearing

14   in both cases.  Mr. Nasar, is the government prepared to

15   proceed?

16        MR. NASAR:  We are, Judge.

17        THE COURT:  And are both defendants prepared to

18   proceed today?  Mr. Layman?

19        MR. LAYMAN:  Yes, Your Honor.

20        THE COURT:  Mr. Hathcoat?

21        MR. HATHCOAT:  Yes, Your Honor.

22        THE COURT:  All right.  And as we discussed,

23   lawyers will be permitted to do separate cross-examinations

1  while the witness is on the stand.  All right.  You may

2  proceed, Mr. Nasar.  Thank you.

3          MR. NASAR:  My witness is just in the hallway.

4  Can I get her?

5          THE COURT:  You may.

6          MR. NASAR:  And just for the record, we're calling

7  Special Agent Rebecca Loeb as our witness.

8          THE COURT:  Okay.

9          *(The witness was duly sworn by the Clerk.)*

10         MR. NASAR:  May I inquire?

11         THE COURT:  You may.

12         MR. NASAR:  Thank you.

13         MR. LAYMAN:  May I remove my mask, Judge?

14         THE COURT:  You may.

15                          REBECCA LOEB,

16  being first duly sworn to testify the truth, the whole

17  truth, and nothing but the truth, testified as follows:

18                       DIRECT EXAMINATION

19  BY MR. NASAR:

20  Q.  Please state your name.

21  A.  Rebecca Loeb.  L-o-e-b.

22  Q.  And by whom are you employed?

23  A.  Homeland Security Investigations.

24  Q.  What is your position there?

25  A.  Special agent.

1   Q.  And what types of crimes do you investigate?

2   A.  A wide variety, mainly specialized in gangs and

3   narcotics.

4   Q.  How long have you worked for Homeland Security?

5   A.  Since August of 2019.

6   Q.  What did you do before that?

7   A.  I was a police officer in Illinois.

8   Q.  For how long were you there?

9   A.  From December of -- or from January of 2014 until August

10   of 2019.

11   Q.  Were you involved in the execution of a search warrant

12   on July 29, 2021 at 4536 South Xenophon Avenue?

13   A.  Yes, I was.

14   Q.  Is that here in Tulsa in the Northern District of

15   Oklahoma?

16   A.  Yes.

17   Q.  And what type of location is that?

18   A.  It's a single family residence.

19   Q.  Was that search warrant approved and issued by a

20   judge?

21   A.  Yes, it was.

22   Q.  And when the warrant was executed, do you know, did law

23   enforcement observe a surveillance system at that

24   location?

25   A.  Yes, they did.

Q. Can you describe what was there as far as
surveillance?

A. There were surveillance cameras on the outside of the
home. And then, once in the home, Tulsa County SWAT noticed
a large screen with different camera views both inside and
outside the house.

Q. Was lawyer -- I'm sorry. Was Laura Kay Sawyer at that
location?

A. Yes, she was.

Q. And she was taken into custody there?

A. Yes.

Q. How about William Colby Cox?

A. He was taken into custody as well.

Q. And where was he -- or what was he doing, I should say,
when law enforcement executed the search warrant?

A. Mr. Cox was attempting to flee out the back door of the
residence.

Q. Now, was law enforcement able to identify if any of the
bedrooms in the residence belonged to either defendant?

A. Yes.

Q. And how many -- do you know how many bedrooms there
were?

A. There was only one bed with -- there was only one room
with a bed in the house.

Q. Okay. And who -- of these defendants, whose room was

1  that?

2  A.  It's both Ms. Sawyer's and Mr. Cox's.

3  Q.  Do you know, were any firearms recovered from this

4  location?

5  A.  Yes.

6  Q.  And what room were they recovered from?

7  A.  They were all in that bedroom.

8  Q.  And now just to go forward, all of the evidence we're

9  going to be talking about, is it recovered from that

10  bedroom?

11  A.  Yes, it is.

12  Q.  So let's talk about the firearms.  How many firearms

13  were recovered?

14  A.  There were six.

15  Q.  Were some of them loaded?

16  A.  Yes.

17  Q.  Do you know, were some of them what's called chamber

18  loaded?

19  A.  Yes.

20  Q.  What does that mean?

21  A.  That means that there was a bullet in the chamber ready

22  to fire when you press the trigger.

23  Q.  And how many firearms -- withdrawn.  Was there a safe in

24  this room?

25  A.  Yes.

1  Q.  How many firearms, if any, were in that safe?

2  A.  There were four firearms in the safe.

3  Q.  Okay.  So the two that were not in the safe, do you know

4  where they were recovered from?

5  A.  Yes.

6  Q.  Where were they recovered from?

7  A.  One was under the pillow, and then one was under the

8  mattress of the bed.

9  Q.  The one that's under the pillow, was it chamber

10 loaded?

11 A.  Yes, it was.

12 Q.  Okay.  Did -- the safe, do you know, was it opened or

13 closed when the search warrant was executed?

14 A.  It was closed.

15 Q.  And was there a key that went to this safe?

16 A.  Yes.

17 Q.  Was that recovered?

18 A.  Yes.

19 Q.  Where was that recovered from?

20 A.  That was in Ms. Sawyer's purse on her key ring.

21 Q.  Is there a type of firearm called a Tec-9?

22 A.  Yes.

23 Q.  And what kind of firearm is that?

24 A.  It's a pistol.

25 Q.  And was there a Tec-9 recovered in this case?

```
1   A.  Yes, there was.

2   Q.  Where was it recovered from?

3   A.  In the safe.

4   Q.  And did it have an extended capacity magazine with it?

5   A.  Yes, it did.

6   Q.  So that means it can take more bullets than maybe a

7   normal pistol would have?

8   A.  Correct.

9   Q.  Was there any -- besides the ammunition that was in the

10  firearms, was there any extra ammunition recovered?

11  A.  Yes, there was.

12  Q.  And approximately how many rounds?

13  A.  In total, approximately 400 rounds were recovered all

14  over the bedroom.

15  Q.  Were there drugs recovered from inside this room?

16  A.  Yes.

17  Q.  All right.  Now, was there any methamphetamine that was

18  recovered?

19  A.  Yes.

20  Q.  Can you tell us, was it all in one spot or in multiple

21  locations?

22  A.  Multiple locations.

23  Q.  And what was -- can you tell us, in general, what was

24  the methamphetamine -- where was it recovered from?  What

25  was it inside?
```

A.   There was some of it next to the bed.  There was some of
it in a black box.  And there was some of it just in
baggies.

Q.   And do you know, were there any drugs inside the safe?

A.   I don't recall.

Q.   And approximately how much methamphetamine was there?

A.   It was over 200 grams, including packaging.

Q.   Was there any heroin that was recovered?

A.   Yes.

Q.   Where was that from?

A.   That was in the black box.

Q.   And approximately how much heroin?

A.   Approximately ten grams.

Q.   Now, were there -- was there a container of pills that
was recovered?

A.   Yes.

Q.   And -- oh, I'm sorry.  Before we move on to the pills.
The methamphetamine, was that field tested?

A.   Yes.

Q.   And did it come back positive for methamphetamine?

A.   Yes, it did.

Q.   Same with the heroin, was it field tested?

A.   Yes.

Q.   Did it come back positive for heroin?

A.   Yes.

1   Q.   Or for opioids?

2   A.   Yes.

3   Q.   The pills now, did they have a particular label on the

4   pill itself, like a stamp on the pill?

5   A.   Yes.

6   Q.   What were they marked?

7   A.   M30.

8   Q.   And what is an M30 in your training and experience?

9   A.   On the street, in my training and experience, an M30 is

10  fentanyl.

11  Q.   Okay.  But what is an M30 supposed to be?

12  A.   Oxycodone.

13  Q.   Okay.  So when you say in your training and experience

14  it's fentanyl, is it they're counterfeit oxycodone?

15  A.   Yes.

16  Q.   Okay.  Now, was there -- at this point, do we have any

17  sort of testing, lab result to tell us what exactly those

18  pills are?

19  A.   We don't have the lab results back now.

20  Q.   Now, you just mentioned your time in the street, and

21  also I'm going to ask you about your training.  Have you had

22  training, either as a police officer or also working as a

23  special agent, related to narcotics?

24  A.   Yes.

25  Q.   And what -- just tell us generally, what did that

1  training involve?

2  A.  It involves classroom training, on-the-job training, and

3  it teaches how narcotics are packaged, where they're

4  commonly stored, and normal methods of drug traffickers.

5  Q.  And as part of your experience, have you made arrests

6  involving people who are using drugs?

7  A.  Yes.

8  Q.  Have you made arrests involving people who are -- who

9  are involved in distribution of drugs?

10  A.  Yes.

11  Q.  Have you had a chance to interview users of drugs?

12  A.  Yes.

13  Q.  And have you had a chance to interview people who are

14  involved in distribution?

15  A.  Yes.

16  Q.  So based on your training and experience, the

17  methamphetamine, the heroin that was recovered here, and

18  those pills, do you believe those items are more indicative

19  of personal use or possession for distribution?

20  A.  Possession --

21       MR. HATHCOAT:  Your Honor, I'm going to object to

22  the form.  It's leading.

23       THE COURT:  Overruled.

24  A.  Possession for distribution.

25  Q.  (BY MR. NASAR)  Why do you say that?

A.  Because of the way they were packaged.  There were

multiple bags, multiple small baggies, and just the nature

of the large quantity suggests distribution.

Q.  Now, based on your training and experience, are firearms

tools in the drug trade?

A.  Yes.

Q.  And what does it mean here that there were firearms in

the vicinity of the drugs that were recovered?

A.  It means that the drug traffickers want to protect their

stash, and may think that they're going to get robbed.

Q.  Now, can you tell us, was Ms. Sawyer interviewed?

A.  Yes.

Q.  And was she given her Miranda warnings before that

interview?

A.  Yes.

Q.  And did she agree to speak with law enforcement?

A.  Yes.

Q.  Can you briefly tell us what she said in that

interview?

A.  Ms. Sawyer said that the address was her house, she

lives there and Mr. Cox helps her pay the bills.  She stated

that there was a small amount of methamphetamine in the room

that belonged to her for personal use, and two of the

firearms that were located in the safe belonged to her.

Q.  And did she tell you -- tell law enforcement what

1   Mr. Cox's relationship to the drugs was?

2   A.  Yes.

3   Q.  What did she say?

4   A.  She said that the large quantity of drugs was Mr. Cox's,

5   and that he is her drug supplier.

6   Q.  Did she say anything about that Tec-9?

7   A.  Yes.

8   Q.  What did she say?

9   A.  She said Mr. Cox brought it to the house a couple of

10  days ago and she saw it then.

11  Q.  And that Tec-9, that was recovered inside the safe?

12  A.  Correct.

13  Q.  Now, was Mr. Cox interviewed?

14  A.  Yes.

15  Q.  And was he given his Miranda warnings as well?

16  A.  Yes.

17  Q.  Did he agree to speak with law enforcement?

18  A.  Yes.

19  Q.  And can you briefly tell us what he said?

20  A.  Mr. Cox said that he had been in a relationship with Ms.

21  Sawyer for a couple of weeks.  He helped her -- he wanted to

22  move in to help her clean up the house, and had been staying

23  there.

24  Q.  And did he say anything about the drugs that were

25  recovered?

1   A.  Yes, he did.

2   Q.  What did he say?

3   A.  He said that the large quantity of drugs belonged to

4   him.

5   Q.  And did both of them in the questioning affirm that that

6   bedroom was their room?

7   A.  Yes.

8           MR. NASAR:  I have no other questions.

9           THE COURT:  Mr. Layman, you may proceed with

10  cross-examination.

11          MR. LAYMAN:  May I have just a moment, Your Honor?

12          THE COURT:  Sure.

13                      CROSS-EXAMINATION

14  BY MR. LAYMAN:

15  Q.  Good afternoon -- morning.

16  A.  Good morning.

17  Q.  Ms. Sawyer admitted to being a methamphetamine user,

18  didn't she?

19  A.  Yes.

20  Q.  And she's supplied by Mr. Cox; correct?

21  A.  Yes.

22  Q.  She admitted to owning or possessing user quantities in

23  the home; correct?

24  A.  Yes.

25  Q.  And those were in a small white box by the bed;

1  correct?

2  A.  I believe so, yes.

3  Q.  You testified -- excuse me.  Additional quantities, more

4  importantly, greater quantities were found in a black box

5  separate from the white box by the bed; correct?

6  A.  Yes.

7  Q.  That's also where cash was discovered?

8  A.  Yes.

9  Q.  Heroin was discovered there?

10 A.  Yes.

11 Q.  And that box had a lock on it, didn't it?

12 A.  I don't recall.

13 Q.  Is that black box what Mr. Cox admitted to possessing

14 himself?

15 A.  Yes.

16 Q.  Separately than the user quantities possessed by Ms.

17 Sawyer; correct?

18 A.  I'm not sure of your question.

19 Q.  There was no money in the white box admitted to by Ms.

20 Sawyer; correct?

21 A.  I don't believe so.

22 Q.  And the guns admitted to being possessed by Ms. Sawyer,

23 those were not out and about in the house, were they?

24 A.  They were in the safe.

25 Q.  They were in the safe.  And the safe was locked, wasn't

1    it?

2    A.  Yes, it was.

3    Q.  Now, of one of the guns possessed -- admitted to being

4    possessed by Ms. Cox -- by Ms. Sawyer, one of those was

5    inoperable; correct?

6    A.  Correct.

7    Q.  It was a Taurus?

8    A.  I believe so.

9    Q.  With the firing pin removed?

10   A.  Yes.

11   Q.  Now, of the currency that was found in this home, all of

12   that was found in the black box; correct?

13   A.  I believe so, yes.

14   Q.  The black box admittedly possessed by Mr. Cox?

15   A.  Yes.

16   Q.  Same with the heroin?

17   A.  The heroin was in the black box, yes.

18   Q.  As was -- as were the pills?

19   A.  Yes.

20   Q.  Now, Mr. Cox told you that he had moved in to help clean

21   up the place.  I think in discovery there's a reference to

22   riffraff.  What is your understanding of what needed to be

23   cleaned up at the place?

24   A.  I was not the agent that interviewed Mr. Cox, so I would

25   defer to my partners who interviewed him for his

1   understanding.  I wasn't there when he said that.

2   Q.  Was it your understanding that this home had been

3   targeted for burglaries prior to this?

4   A.  I have no idea.

5   Q.  With respect to Ms. Sawyer, she didn't run, did she?

6   A.  Correct.

7   Q.  In fact, she fully cooperated with investigators upon

8   their arrival; isn't that correct?

9   A.  That's correct.

10              MR. LAYMAN:  Thank you.

11              THE COURT:  Thank you.  Let the record reflect

12  this is Mr. Hathcoat conducting cross-examination on behalf

13  of Defendant Cox.

14              MR. HATHCOAT:  Thank you, Your Honor.  May I

15  inquire?

16              THE COURT:  You may.

17                    CROSS-EXAMINATION

18  BY MR. HATHCOAT:

19  Q.  Agent, where were you when the residence that you've

20  testified about was entered by law enforcement?

21  A.  Myself and my partners were at a secondary staging

22  location while Tulsa County SWAT executed the warrant.

23  Q.  Okay.  How far away from the residence were you when the

24  warrant was actually executed?

25  A.  I would say less than a mile.

Q.  Okay.  And how long after the time the warrant was
executed did you then enter the residence?

A.  It was probably 10 to 15 minutes after the SWAT
commander told us that the scene was secure.

Q.  And I'm sorry to belabor this, but how much time between
the time the warrant was executed and law enforcement
entered the residence up to the time that you were notified
that the scene was secure?  How much time?

A.  It was probably around 10 to 15 minutes.  I can't
remember an exact time.

Q.  No, I understand.  But that's your best estimate?

A.  Yes.

Q.  Who was involved in the actual recovery of evidence?
For instance, was there a recovery team?

A.  Yes.  So there's an interview team, and then the rest of
the agents and officers are inside the house doing a
search.

Q.  Okay.  And who were those officers that actually
conducted the search and recovered the evidence?

A.  Do you want me to name every person?

Q.  If you know them.

A.  My best recollection, there was Erin Stanich *(phonetic)*.
She's an agent.  Dan Jones.  He's an agent.  Andy Titsworth.
He's a task force officer.  Tom Helm.  He's a task force
officer.  Dustin Carter.  He's an agent.  And then myself,

1   Marlon Warren were interviewing.  Garrett Hendrickson and

2   Ryan Case were interviewing.  And the four of us that were

3   interviewing did enter the residence at different times.  I

4   believe that's all that was there, best I can remember.

5   Q.  Okay.  On the recovery team, it's right to say that

6   there was evidence of personal drug use within the residence

7   that was recovered on the search warrant; is that correct?

8   A.  I'm not sure I understand the question.

9   Q.  Okay.  When I say evidence of personal drug use there in

10  the residence, were there needles there?

11  A.  Yes.

12  Q.  And were those recovered?

13  A.  No.

14  Q.  Were there smoking pipes, drug smoking pipes in the

15  residence?

16  A.  Yes.

17  Q.  Were those recovered?

18  A.  No.

19  Q.  Were those photographed?

20  A.  Yes.

21  Q.  Was there other evidence of personal drug use within the

22  residence, such as paraphernalia like I just described?

23  A.  Yes.

24  Q.  Can you talk about those other items of personal drug

25  use?  Describe those for us?

1   A.   Based on -- or besides the pipes and the needles, I

2   can't recall other items at this time.

3   Q.   Okay.  With regard to the guns that were recovered from

4   the residence that you testified about, were any of those

5   guns examined for latent prints?

6   A.   No.

7   Q.   Why not?

8   A.   Well, if we sent them for latent prints, we would not

9   have the results back by now.  And then the other reason is

10  because when people admit ownership of them, we don't

11  typically send them for latent prints.

12  Q.   Okay.  Was there -- I'm sorry.  Strike that.  Did anyone

13  run a registration check of any of the weapons that were

14  recovered from the residence associated with your team?

15  A.   We ran the serial numbers of them, and none of them were

16  stolen.

17  Q.   Okay.  Did any of the registration on any of the guns

18  recovered check back to Mr. Cox?

19  A.   You can't get registrations when you run a serial

20  number.  It would just come back if it was stolen.

21  Q.   Okay.  So it's right to say that you can't say that any

22  of the weapons that were recovered were registered to

23  Mr. Cox.  That's true, isn't it?

24  A.   I don't really feel comfortable asking that.  I would

25  rather an ATF agent answer that.  I'm not too familiar with

1   the tracing of firearms.

2   Q.  Okay.  Well, you're familiar with the registration of

3   firearms, though; right?

4               MR. NASAR:  Objection.

5               THE COURT:  Overruled.

6   Q.  (BY MR. HATHCOAT)  You're familiar with the basic

7   registration of firearms, aren't you?

8   A.  Yes.

9   Q.  Okay.  You can't say, as you sit there right now, that

10  any of the weapons that were recovered from the residence

11  were registered to Mr. Cox, can you?

12  A.  Correct.

13  Q.  With regard to any of the drug packaging that was

14  recovered from the residence, were any of those items

15  examined for latent prints?

16  A.  No.

17  Q.  How about any of the evidence that was recovered from

18  the residence, were any items analyzed for latent prints?

19  A.  No.

20  Q.  The box that you've testified about that contained a

21  quantity of drugs, it's right to say that wasn't analyzed

22  for latent prints; correct?

23  A.  That's correct.

24  Q.  But that box was recovered, right, and taken into

25  evidence?

1  A.  I don't recall if they took the actual box or just the

2  contents.  I'm not sure.

3  Q.  What was the size of that box?

4  A.  Do you mean like the dimensions of it?

5  Q.  The dimensions, yeah.  Your best estimate?

6  A.  I don't know.

7  Q.  Was it the size of a floor safe, or was it the size of a

8  cigar box, or can you -- can you describe it like that?

9  A.  I would say it was a little bigger than a shoe box.

10 Q.  Okay.  Did you see any of the drugs that were recovered

11 in that box?

12 A.  I saw the photographs.

13 Q.  Within that box, were there any residency papers or

14 identification papers within that box?

15 A.  I don't believe so, no.

16 Q.  It's right to say that this residence was described -- I

17 believe defense counsel described it as a flop house.  Is

18 that right?

19 A.  I don't know if defense counsel said that, but I put

20 that in my search warrant, yes.

21 Q.  Okay.  That would have been a better question.  What

22 caused you to describe that house as a flop house in your

23 search warrant affidavit?

24 A.  Just discussing with other agents and officers, a flop

25 house is a house where drug users and traffickers and gang

1   members come and go as they please.  And law enforcement had

2   been looking at that house for a couple of years due to the

3   increased traffic coming from it.

4   Q.  When did you start to focus your attention on the

5   house?

6   A.  About two weeks before the search warrant.

7   Q.  Were you actually conducting surveillance, or were you

8   just -- well, let me ask a better question.

9                   In those two weeks before the search warrant,

10  did you actually conduct some surveillance of the house?

11  A.  Yes.

12  Q.  And how long a period of time did you do that?

13  A.  I went out on surveillance, I believe it was twice.  And

14  our task force officers conducted the rest of the

15  surveillance.

16  Q.  During the two times that you did it, how would you

17  describe the time, the actual amount of time that you spent

18  surveilling the house?

19  A.  Well, we could not sit on the house and watch it due to

20  it being in a bad location for officer safety reasons, so

21  the surveillance only consisted of drive-bys for myself and

22  task force officers.

23  Q.  When you did those -- how many drive-bys did you do?

24  A.  I personally did two.

25  Q.  Okay.  In the time that you did those drive-bys, did you

1  observe what you believed to be people coming and going from

2  the residence?

3  A.  When I drove by, I personally did not see people.

4  Q.  Okay.  How about your conversations with other officers,

5  did you get some feel for how frequently people came and

6  went from the residence?

7  A.  Yes.

8  Q.  And describe that for the Court if you can.

9  A.  One of our task force officers drove by and he saw three

10  vehicles all back to back within a short period of time.

11  Two of them stayed for around five minutes he said.  This is

12  Task Force Officer Marlon Warren.  And one of them stayed

13  for longer, approximately ten minutes.  And agent -- or Task

14  Force Officer Warren was having to drive by and then come

15  back and drive by and come back because he could not sit

16  stationary on the house.

17  Q.  Let me ask the question this way:  During those two

18  weeks that you were focused on the residence, how many

19  people would you say came and went from that -- from any

20  basis of knowledge, either talking with other agents or your

21  own personal observations?

22  A.  I don't -- I'm not sure in the two weeks.  I couldn't

23  guess on a number.

24  Q.  Obviously enough people came and went and stayed

25  overnight at that residence for you to describe the

1  residence as a flop house in your search warrant affidavit;

2  right?

3  A.  That's correct.

4  Q.  Okay.  Did you determine who else lived at the residence

5  at the time that the warrant was served?

6  A.  In talking with Ms. Sawyer, we determined that there was

7  another subject living there that day.

8  Q.  Had there been other subjects living there, for instance

9  within the two weeks that you were focused on the residence,

10 in addition to the two defendants and the subject you just

11 described?

12 A.  According to Ms. Sawyer, yes.

13 Q.  Okay.  Did you determine how many people?

14 A.  Yes.  One other person.

15 Q.  Just one other person during that two weeks?

16 A.  That's what Ms. Sawyer said.

17 Q.  And who was that person?

18 A.  Jonathan Bevins.

19 Q.  Did you ever come into contact with Mr. Bevins?

20 A.  No.

21 Q.  Have you ever interviewed Mr. Bevins in any way, over

22 the phone or anything else?

23 A.  No.

24 Q.  So you've never asked Mr. Bevins, for instance, if any

25 of the guns or drugs recovered from the residence belonged

1  to Mr. Bevins?  That's right, isn't it?

2  A.  That's correct.

3  Q.  Okay.  There were other residency papers for other

4  individuals recovered from the residence; is that right?

5  A.  I believe there are other identification documents.  I

6  don't recall the names on them.  But, yes, they were -- they

7  were photographed.

8          MR. HATHCOAT:  May I approach the witness, Your

9  Honor?

10         THE COURT:  You may.

11  Q.  (BY MR. HATHCOAT)  Agent, I'm going to hand you some

12  photographs.  Agent, I've just handed you some photographs.

13  I think I've handed you one, two, three, four, five

14  photographs.  They're not numbered sequentially, so I'll

15  just identify them by number when we do talk about them.

16         MR. HATHCOAT:  If it would help the Court, I've

17  got a copy for the Court.

18         THE COURT:  You can hand them up at this time.

19  Thank you.

20  Q.  (BY MR. HATHCOAT)  So I want to direct your attention to

21  the photograph that's marked 83.  Do you see that one?

22  A.  Yes, I do.

23  Q.  Okay.  What does this picture depict?

24  A.  It looks like a storage room.

25  Q.  Is it one of the bedrooms within the residence?

1  A.  I was -- I never entered this bedroom, so I don't -- I

2  don't know if there's a bed in here.  I don't know anything

3  about it.  I was never in this room.

4  Q.  Okay.  Is this photograph one of the pictures that was

5  taken by the search warrant team?

6  A.  Yes, it is.

7  Q.  Okay.  You've reviewed this photograph prior to your

8  testimony today, haven't you?

9  A.  Yes.

10 Q.  Okay.  So this photograph does depict a room from the

11 house that's the subject of this case; right?

12 A.  Yes.

13 Q.  Okay.  It's fair to say that large portions of this

14 house contained a lot of clutter and detritus much like is

15 depicted in this photograph marked as 83.  That's fair,

16 isn't it?

17 A.  Yes.

18 Q.  Okay.  And that was your observation when you entered

19 the residence; correct?

20 A.  Yes.

21 Q.  Okay.  The next photograph I have is number 133.  Do you

22 have that one?

23 A.  Yes.

24 Q.  Okay.  That's a photograph of a letter that was

25 recovered from the residence bearing Laura Sawyer's name;

1  correct?

2  A.  Yes.

3  Q.  At the same address where the search warrant was served;

4  correct?

5  A.  Correct.

6  Q.  I'm going to show you or direct your attention to

7  photograph number 146.

8  A.  Yes.

9  Q.  That's photograph of the document that was recovered in

10  the residence as well; yes?

11  A.  Yes.

12  Q.  And it reflects the name of Randy Helvey; is that

13  right?

14  A.  That's correct.

15  Q.  Okay.  The next photograph I want you to look at is

16  marked 156.  That's a photograph of the document that was

17  recovered from the residence that was under investigation;

18  correct?

19  A.  Yes.

20  Q.  And that was taken by the search warrant team --

21  A.  Yes.

22  Q.  -- true?  And this photograph obviously reflects the

23  name of Daniel Mercer; is that true?

24  A.  That's the billing detail, yes.

25  Q.  But it also shows the address of 4532 Xenophon, which is

1   the subject residence; correct?

2   A.  No.  4536 is the subject residence.

3   Q.  Okay.  Thank you.  In the next column over, the

4   residence of 4536 Xenophon is depicted in that same

5   photograph 156; right?

6   A.  Yes.

7   Q.  And it's got a name that says Hollywood on it?

8   A.  Yes.

9   Q.  Okay.  Finally, I'd like you to take a look at a

10  photograph that's marked as document number 64.  That's

11  photograph of a note that was recovered from the residence.

12  Is that true?

13  A.  Yes.

14  Q.  Okay.  Can you read this note?

15  A.  Do you want me to read it out loud?

16  Q.  I'm just wondering if you can.

17  A.  Oh.  Yes, I can.

18  Q.  Okay.  It's signed Psycho Mike.  Do you see that?

19  A.  I do.

20  Q.  Okay.  And the photograph obviously says that somebody

21  waited for someone else at the McDonald's but didn't find

22  them there, so they returned home.  Is that right?

23  A.  I mean, I can read what it says.

24  Q.  Sure.  If that's easier, that's fine.

25  A.  Bro, I waited at McDonald's but you wasn't there, so I

1  came back to the house and sat here for a long while.  I

2  will be right back.  Okay.  Psycho Mike.

3  Q.  What part of the residence was this note recovered from,

4  if you know?

5  A.  It was on a table right outside the house on the

6  porch.

7  Q.  Okay.  Did you see this note?

8  A.  I did.

9  Q.  Okay.  Were any residency papers, like the ones we just

10 reviewed, recovered from the residence that reflected

11 Mr. Cox's name on it?

12 A.  No.

13 Q.  You knew that Mr. Cox was a subject of the investigation

14 when the search warrant was served; is that right?

15 A.  I'm not sure what you mean by that.

16 Q.  Well, you knew who Mr. Cox was at the time the search

17 warrant was served?

18 A.  Yes.

19 Q.  Okay.  And it's fair to say that Mr. Cox was a subject,

20 at least in part of the investigation that led to the search

21 warrant.  Is that true?

22 A.  Just due to his affiliation with the Irish Mob.  There

23 were many people who were possibly associates.

24 Q.  When you say associates, what do you mean?  Associates

25 of people who lived at the house?

1  A.  Correct.

2  Q.  Okay.  But Mr. Cox's name was on your radar at the time

3  the search warrant was served?

4  A.  I would say yes.

5  Q.  Okay.  So Mr. Cox obviously was present at the home when

6  the search warrant was served; is that right?

7  A.  Yes.

8  Q.  Okay.  So it's fair to say that the search warrant team

9  and those people that were recovering evidence from the --

10  from the house were looking for residency papers for Mr. Cox

11  during the search of the residence.  That's true, isn't

12  it?

13  A.  I would say they were looking for residency for

14  anybody.

15  Q.  Okay.  Including Mr. Cox; right?

16  A.  Yes.

17  Q.  And they knew who Mr. Cox was while they were serving

18  the search warrant; is that true?

19  A.  They knew his name.

20  Q.  Okay.  You mentioned earlier that you were not present,

21  at least for part of the interview of Mr. Cox.  Were you

22  present for any of Mr. Cox's interview at the residence?

23  A.  I talked to him briefly, but I would not characterize

24  myself as being in his interview, no.

25  Q.  Okay.  Was it --

1   A.   It was -- it was assigned to two other agents.

2   Q.   I understand.  Did you talk to him before or after he

3   was advised of Miranda?

4   A.   After.  I also talked when -- when we first got on

5   scene, I said hello to him, so I did not interview him

6   before, but just to be clear.

7   Q.   Okay.  Did anybody ever ask Mr. Cox if he was a drug

8   user?

9   A.   I don't know.

10   Q.   Do you have any reason to believe, as part of your

11   investigation, that Mr. Cox is a drug user?

12   A.   Yes.

13   Q.   And what is that?

14   A.   Based on Ms. Sawyer's statements.

15   Q.   Okay.  Anything else?

16   A.   Based on the paraphernalia found inside the house.

17   Q.   And when you say paraphernalia, you're talking about

18   drug paraphernalia that was recovered from the house;

19   right?

20   A.   Yes.

21   Q.   Was there any drug paraphernalia recovered from the

22   bedroom that you believe Mr. Cox was staying in?

23   A.   Yes.

24   Q.   Okay.  What kind of paraphernalia?

25   A.   Needles and pipes.

1  Q.  Okay.  Were you present during the time anyone ever

2  asked Mr. Cox where he was staying?

3  A.  No.

4  Q.  Did anybody, prior to giving Mr. Cox Miranda warnings,

5  ask him if he was under the influence of drugs at that

6  time?

7  A.  I have no idea.

8  Q.  Did anybody determine when the last time Mr. Cox might

9  have used drugs was immediately before he was given Miranda

10  warnings?

11  A.  I don't know.

12  Q.  Okay.  So you don't know whether or not the agents that

13  interviewed Mr. Cox and advised him of Miranda did anything

14  at all to determine whether or not he was under the

15  influence of drugs at the time they gave him those Miranda

16  warnings?  You don't know, do you?

17  A.  I don't know.

18  Q.  Okay.  Mr. Cox, you testified, indicated that he was in

19  a romantic relationship with Ms. Sawyer at the time he was

20  interviewed; is that true?

21  A.  Yes.

22  Q.  And did you -- did you determine how long he had been

23  involved in a romantic relationship with Ms. Sawyer?

24  A.  He said a couple of weeks.

25  Q.  Okay.  Do you know how he described that relationship?

1  For instance, how involved the relationship was, or whether

2  that was an exclusive relationship, anything like that?

3  A.  I don't know.

4  Q.  Okay.  Do you know whether Mr. Cox indicated he was in

5  love with Ms. Sawyer?

6  A.  I don't know.

7  Q.  When Mr. Cox was first detained after the warrant was --

8  was served, I believe you described this, him attempting to

9  flee out the back door.  Is that what you said?

10  A.  Yes.

11  Q.  Okay.  Did Mr. Cox have any -- do you know whether or

12  not he had any dogs in the house?

13  A.  Yes.  There were three dogs in the house.

14  Q.  Okay.  Did anybody ever ask him about those dogs, who

15  the dogs belonged to, anything like that?

16  A.  I don't know.

17  Q.  Okay.  You never asked him about that, did you?

18  A.  I never asked him.

19  Q.  Okay.  When Mr. Cox was first detained by law

20  enforcement, did they search him for anything like guns or

21  drugs at that time?

22  A.  I would assume so, but I don't know.  I was not there.

23  Q.  What time of the day or night was the warrant served?

24  A.  6:00 a.m.

25  Q.  How was Mr. Cox dressed, if you know, when he was first

1  detained?

2  A.  He was wearing no shirt, and I believe he had shorts

3  on.

4  Q.  Okay.  Do you know whether any drugs or guns were

5  recovered from Mr. Cox's person when he was detained by law

6  enforcement?

7  A.  I don't believe there were any, no.

8  Q.  Okay.  So why did law enforcement then not release him

9  if he was attempting to leave?

10  A.  He had warrants for his arrest.

11  Q.  Okay.  When you say that Mr. Cox was detained while he

12  was trying to flee, was he actually inside the residence or

13  outside the residence when he came into contact with law

14  enforcement?

15  A.  I don't know specifically.  But the SWAT commander told

16  us he was attempting to flee out the back door, so I don't

17  know if he had completely made it out.  I know that SWAT had

18  guys on the rear perimeter, so that's who got him.

19  Q.  Okay.  I think your testimony is clear but I just want

20  to make sure I recall it correctly.  You don't know whether

21  Mr. Cox was inside the residence or outside the residence

22  when he was first contacted by law enforcement when they

23  served the warrant; is that correct?

24  A.  The way I understand it, he was making his way out the

25  back door, so I don't know if his feet were inside or

1  outside.

2  Q.  Okay.  That answers my question.

3       MR. HATHCOAT:  I don't have any further questions,

4  Your Honor.  Thank you.

5       THE COURT:  Thank you.  All right.  Redirect?

6       MR. NASAR:  Yes.  Very briefly, Your Honor.

7                    REDIRECT EXAMINATION

8  BY MR. NASAR:

9  Q.  In your training and experience, have you ever seen drug

10 users who are often -- who are also involved in distribution

11 of drugs?

12 A.  Yes.

13 Q.  And have you ever seen drug users who possessed

14 quantities of drugs for distribution?

15 A.  Yes.

16 Q.  Now, how many total guns were recovered from the

17 bedroom?

18 A.  Six.

19 Q.  And how many total guns were in the safe?

20 A.  Four.

21 Q.  And one of the ones that's in the safe, was that the

22 Tec-9?

23 A.  Yes.

24 Q.  And what did Ms. Sawyer tell you about the Tec-9?

25 A.  That she had seen Mr. Cox with it a couple of days ago.

1  He came home with it.

2  Q.  Okay.  So we have -- and how many guns did Ms. Sawyer

3  say belonged to her?

4  A.  Two.

5  Q.  All right.  So we have three in the safe, and then the

6  Tec-9.  Did she say the two that belonged to her, were they

7  both in the safe, was one in the bedroom, or do you know?

8  A.  They were both in the safe.

9  Q.  The Taurus that was not operable -- right, there was a

10  Taurus that wasn't operable?

11  A.  That's correct.

12  Q.  Were there any parts found that could make that Taurus

13  work?

14  A.  Yes.

15  Q.  And what was that part?

16  A.  That was a firing pin.  One of the pictures was the

17  order for the firing pin.

18  Q.  Is that 156, that's an order form that mentioned a

19  firing pin?

20  A.  Yes.

21  Q.  And the shipping details has the address we've been

22  talking about, and it has a name, Hollywood; correct?

23  A.  Yes.

24  Q.  Who is Hollywood?

25  A.  Laura Sawyer.

1    Q.   How do you know that?

2    A.   Because Laura Sawyer told us that was her nickname.

3    Q.   Okay.  And you mentioned the Irish Mob.  What -- do you

4    know, are either of these defendants connected to the Irish

5    Mob?

6                          *(Overspeaking)*

7             MR. HATHCOAT:  I'll object to that.

8             MR. LAYMAN:  It's absolutely irrelevant to the

9    elements of the crimes that are charged.

10            THE COURT:  Overruled.  And, Mr. Hathcoat, you

11   brought up the Irish Mob yourself in a question.

12   Q.  (BY MR. NASAR)  Do you know if either of these

13   defendants are connected?

14   A.   Yes.

15   Q.   How do you know that?

16   A.   Ms. Sawyer told us she's been associated with the Irish

17   Mob for 15 years.  She has multiple tattoos that would

18   suggest that, such as her clovers.  And Mr. Cox, he also has

19   clovers tattooed, and he has the word Sinn Fein on his back,

20   which is a moniker of the Irish Mob.

21   Q.   And did he tell you he was involved in the Irish Mob?

22   A.   Yes.

23   Q.   Or I'm sorry, not you.  Law enforcement?

24   A.   Yes.

25   Q.   And is the Irish Mob involved in drug distribution?

1    A.  Yes.

2              MR. NASAR:  I have no other questions.

3              THE COURT:  All right.  Anything further, Mr.

4    Layman?

5              MR. LAYMAN:  Just a moment, Your Honor.

6              THE COURT:  Of course.

7              MR. LAYMAN:  No, Your Honor.

8              THE COURT:  All right.  Thank you.  Mr. Hathcoat,

9    anything further at this time?

10             MR. HATHCOAT:  No, Your Honor.

11             THE COURT:  Okay.  You may step down.  Thank

12   you.

13             THE WITNESS:  Thank you.

14             THE COURT:  Mr. Nasar, does the government have

15   any other evidence to present?

16             MR. NASAR:  No, Your Honor.

17             THE COURT:  Is the government asking the Court to

18   consider the affidavit?

19             MR. NASAR:  Yes, Judge.  Yeah, we are asking Your

20   Honor to consider the testimony and the affidavit also that

21   was -- that was signed by this witness.

22             THE COURT:  All right.  Mr. Nasar, are you

23   prepared for arguments in support -- well, I'm sorry.  Mr.

24   Layman or Mr. Hathcoat, do you have any evidence that you

25   wish to present as to this preliminary hearing?

1          MR. LAYMAN:  None on behalf of Defendant Sawyer,

2    Your Honor.

3          THE COURT:  Thank you.

4          MR. HATHCOAT:  Not from Mr. Cox, Your Honor.

5          THE COURT:  Thank you.  All right.  We're prepared

6    to proceed to argument at this time.

7          MR. NASAR:  Judge, I'd ask that Your Honor find

8    that there's probable cause that both of these defendants

9    committed --

10         THE COURT:  Could you please come to the podium?

11         MR. NASAR:  I ask that Your Honor find there's

12   probable cause that both defendants committed felonies, and

13   that it is these defendants that committed those crimes, and

14   we'll rely on the testimony from the witness and the

15   affidavit.

16         THE COURT:  All right.  Mr. Layman.

17         MR. LAYMAN:  We would demur to the sufficiency of

18   the evidence, specifically there is no testimony linking the

19   individuals involved in the execution of the search warrant

20   to these individuals here in court today.

21              Second, with respect to 841 and with respect

22   to Ms. Sawyer, there is no evidence of intent to distribute

23   on her behalf.  In fact, all the statements as offered

24   indicate that she possessed personal use quantities as

25   supplied by another.  With respect to 924(c), we would also

1   argue that there's an insufficient nexus between firearms

2   locked away in a safe, one of which is not operable, and the

3   trafficking of drugs, which again we believe the evidence

4   was insufficient to support on behalf of Ms. Sawyer.

5        THE COURT:  Thank you, sir.  All right.  Mr.

6   Hathcoat.

7        MR. HATHCOAT:  Your Honor, we'd also demur.  We

8   argue that the government has failed to make its case

9   demonstrating probable cause in this matter.  There's no

10   I.D. of the -- of Mr. Cox.  We'd argue more specifically

11   there's only evidence at best of quantities of drugs for

12   personal use.  There's insufficient evidence of intent to

13   distribute in this matter.  The only evidence of Mr. Cox --

14   or that the contraband, the drugs, and the guns were tied to

15   Mr. Cox is his own statement and that of a co --

16   co-defendant.  The co-defendant's statement is not

17   corroborated other than Mr. Cox's statement.  I think the

18   government has failed to meet its burden that Mr. Cox's

19   statement was given freely and voluntarily.

20        THE COURT:  All right.  Thank you.  Court will

21   take a brief -- anything further, Mr. Nasar?

22        MR. NASAR:  No, Your Honor.  Thank you.

23        THE COURT:  Okay.  Court will take a brief recess.

24               *(Off the record at 11:47 a.m.)*

25            *(Back on the record at 12:03 p.m.)*

1    THE COURT:  Probable cause exists when, under the

2  totality of the circumstances, there is a reasonable

3  probability that a crime has been committed and that it was

4  committed by the defendant charged.  It's well established

5  that the government's burden is relatively low to prove

6  probable cause at the preliminary hearing stage.  The rules

7  of evidence don't apply to preliminary hearings, and a

8  finding of probable cause can be based on hearsay, and it

9  can also be based on evidence that could ultimately be

10  subject to suppression, which negates at least part of

11  Defendant Cox's argument related to the confession.

12    These defendants in this case, or in each of

13  these cases in the complaints are charged with possession of

14  methamphetamine with intent to distribute, drug conspiracy,

15  and possession of a firearm in furtherance of a drug

16  trafficking crime.

17    The Court finds probable cause to believe

18  that each of those crimes were committed by each defendant.

19    Specifically, with respect to Ms. Sawyer

20  first, there's probable cause to believe that Ms. Sawyer

21  possessed the methamphetamine found in the southwest bedroom

22  with intent to distribute, and that she participated in a

23  drug conspiracy with Defendant Cox.  First, there's evidence

24  presented that Ms. Sawyer pays utilities at the residence,

25  and, at the time of the search, slept in and resided in the

southwest bedroom with Defendant Cox where the drugs were

found.  There is also evidence that quantities of drugs

indicative of drug distribution were found in that bedroom.

The principal issue that I see being raised

by Ms. Sawyer is whether there is evidence tying her to

items found in the black box, which contained the

distribution quantity of drugs.

The Court finds the distribution quantity of

drugs being found in her residence found in her bedroom,

combined with the money and firearms in the bedroom, and the

evidence of foot traffic observed by the officer prior to

the search to create probable cause that Ms. Sawyer

possessed the drugs -- also possessed the drugs in the black

box with intent to distribute.  I understand her position is

that all drugs in the black box were possessed only by Cox,

but I believe that's a jury question, and I believe it's a

jury question even if the two defendants are now telling the

same story that only Cox had access to that box.  So there's

probable cause for Sawyer as to the drug crimes based on her

admitted residency at this location, and the totality of the

circumstances that she possessed those drugs with intent to

distribute, and was participating in a conspiracy with Cox

to distribute them.

As further evidence of a drug conspiracy

between them, both admitted to association with the Irish

1  Mob, although that's a small piece of the Court's

2  consideration as to probable cause, and there's certainly

3  probable cause without that fact.

4  Now, turning to Mr. Cox.  Well, I'll stick

5  with the firearm -- I'll go to the firearms with respect to

6  Ms. Sawyer before I move to Mr. Cox.

7  With respect to possession of a firearm in

8  furtherance of the drug trafficking crime, Ms. Sawyer

9  admitted to having the key to the safe that possessed all

10  six firearms which was found in the same bedroom as the

11  drugs.  There's an adequate nexus for probable cause

12  purposes between the drugs found in the safe -- I'm sorry --

13  between the firearms found in the safe to which Sawyer had

14  access, and the drugs found in the bedroom to find probable

15  cause that she possessed those firearms in furtherance of a

16  drug trafficking crime.  At a minimum, there's evidence she

17  possessed the two firearms that she admitted to owning, and

18  they were also found in close proximity to the drugs.

19  Now with respect to Mr. Cox, there is also

20  adequate evidence to provide probable cause to believe

21  Mr. Cox possessed the methamphetamine found in the southwest

22  bedroom with intent to distribute, and that he participated

23  in a drug conspiracy with Ms. Sawyer.  First, he admitted to

24  being in a relationship with Ms. Sawyer and to residing at

25  the house and in the southwest bedroom where the drugs were

1  found for at least two weeks prior to the search.  He also

2  admitted to knowing about the existence of drugs in the

3  house.  Officers observed foot traffic leading up to the

4  search, and located distribution quantities of drugs in the

5  bedroom which were indicative of distribution.  As I

6  indicated, there was also cash, firearms, and other indicia

7  of distribution.  Mr. Cox told officers he was there to

8  chase off riffraff, according to the affidavit, and was not

9  in possession of the drugs, but a jury could certainly find

10  otherwise.  And there is probable cause to believe Mr. Cox

11  and Ms. Sawyer were in a conspiracy to sell the drugs

12  together based on both of their relative access to guns,

13  drugs and cash found in the bedroom.  Additionally, as I

14  indicated, both associated -- admitted to association with

15  the Irish Mob.

16          As to the firearms, Mr. Cox admitted to

17  possessing four of the guns found in the house in the same

18  room as the drugs, and, at a minimum and specifically based

19  on the evidence I've heard today, there's probable cause to

20  believe he possessed the Tec-9 in furtherance of the drug

21  trafficking crime.

22          So with that, the Court does find probable

23  cause for all three charges in the complaint, and probable

24  cause to bind these defendants over.

25          Is there anything further, Mr. Nasar, from

1  the government?

2          MR. NASAR:  No, Your Honor.

3          THE COURT:  Is there anything further at this

4  time, Mr. Layman?

5          MR. LAYMAN:  No, Your Honor.

6          THE COURT:  All right.  Anything further, Mr.

7  Hathcoat?

8          MR. HATHCOAT:  No, Your Honor.

9          THE COURT:  All right.  Thank you.  Court's

10  adjourned.

11              *(Off the record at 12:09 p.m.)*

12                  *   *   *   *   *

13              C E R T I F I C A T E

14        WHILE NOT PRESENT TO STENOGRAPHICALLY REPORT THE

15  FOREGOING PROCEEDINGS, I CERTIFY THAT IT WAS TRANSCRIBED TO

16  THE BEST OF MY ABILITY FROM A DIGITAL AUDIO RECORDING.

17        IN WITNESS WHEREOF, I HAVE HEREUNTO SET MY HAND

18  THIS 9th DAY OF SEPTEMBER, 2021.

19

20                          s/Ken Sidwell
                            Ken Sidwell, CSR-RPR

21

22

23

24

25

**United States District Court**